**Garnett William CAPE,
Petitioner-Appellant,**

v.

**Robert FRANCIS, Warden,
Respondent-Appellee.**

**No. 83–8341.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 31, 1984.

depravity of mind, or an aggravated battery to    the victim."

Stephen B. Bright, Atlanta, Ga., Ronald J. Tabak, John Charles Boger, New York City, for petitioner-appellant.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

■■■■■■■■■

Before HENDERSON and HATCHETT, Circuit Judges, and JONES, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

Garnett William Cape, a Georgia state prisoner under sentence of death, appeals an order of the United States District Court for the Middle District of Georgia denying his petition for writ of habeas corpus. Cape assigns as error (1) the admission into evidence of expert psychiatric opinion testimony in violation of his constitutional privilege against compelled self-incrimination and his constitutional right to assistance of counsel; (2) the admission of self-incriminating pre-trial statements made while in police custody; (3) the admission into evidence during the sentencing phase of his trial of the opinion testimony of an agent of the Georgia Bureau of Investigation concerning the outrageous and vile nature of the murder and the youthfulness of the victim; (4) ineffective assistance of counsel; (5) the imposition of the death sentence on the basis of a single and unconstitutionally vague aggravating circumstance; (6) the failure of the Supreme Court of Georgia to consider cases in which life sentences were imposed in the conduct of its proportionality review of his death sentence; and (7) the district court's refusal to grant him an evidentiary hearing to develop material facts crucial to his claim that the death sentence is discriminatorily applied in Georgia. We have examined the record of this case and conclude that Cape was tried, convicted and sentenced to die in accordance with the Constitution. We therefore affirm the district court's denial of Cape's petition for writ of habeas corpus.

Based upon a series of events occurring on May 17, 1979 in and around Franklin County, Georgia, the petitioner, Garnett William Cape, then a fifty-six year old male, was indicted for the murder of Karen Dove, the fifteen year old step-daughter of his niece. The historical facts are accurately summarized in *Cape v. State,* 246 Ga. 520, 272 S.E.2d 487 (1980):

"From the evidence presented at trial, the jury was authorized to find the following facts:

"The appellant, a 56-year-old male, was the uncle of the victim's mother. He was well acquainted with the victim's family. The victim's father and the appellant had hunted and fished together often. He had socialized with the victim's family on many occasions, and had worked with the victim's brother. He had developed a close relationship with all the members of the family, including the victim, a 15 year old high school student.

"Approximately three months prior to the murder, the appellant had been told by the victim's mother to stay away from the victim. The mother testified that the appellant 'seemed a little too interested in her.' The victim was also told to stay away from the appellant. In response, the appellant ceased visiting the family but continued to see the victim's father and brother at their places of employment.

"The appellant had promised to buy the victim an expensive car. They had looked at the car together. On the 14th day of May, the appellant had signed a purchase order. He had asked for a delay in delivery in order to get funds from a Texas bank. It was later established at trial that the appellant did not have such an account.

"On the morning of the murder, the appellant drove the victim and her friend, Tammy Lee Dickerson, to school. He talked to the victim alone in the car for a few minutes after her friend went into the school. The victim was last seen alive leaving school at approximately 3:15 p.m.

"At approximately 4:45 p.m., the appellant came into the victim's brother's place of employment and told him he had 'lost' his sister. The victim's brother no-

ticed that appellant was frightened, nervous, and had cuts on his hands and scratches on his face.

"The appellant explained that he had picked up the victim after school, and had taken her to the courthouse to get her birth certificate, which was required to enable her to obtain a learner's driving permit. He testified that she went into the courthouse but didn't come out, and although he had looked for her, she was missing.

"The victim's brother then began to search for his sister. The appellant had the victim's brother drive him to see a classmate of the victim. Appellant asked her whether the victim was in a good mood that day. Thereafter, the appellant went to the victim's father and, in tears, told him the same story. In response the victim's father told the appellant that, 'You know you wasn't suppose to pick her up,' and the appellant replied, 'Yeah, I'll never bother her again, I'll never buy her nothing else.'

"It was established that the victim's mother had gotten the victim a birth certificate and learner's permit the day prior to the murder.

"The victim's brother accompanied by Tammy Lee Dickerson and another young female continued to search for the victim. He had gone to the appellant's house, but finding no one home had not entered. Later, the victim's brother and his companions returned to the appellant's house. He found a note on the back door which read, 'Gone to Anderson. Garnett.' The victim's brother then broke into the house through the front door. He found the front room and kitchen in an unusually neat and clean condition.

"The victim's friend, Tammy Lee Dickerson, found the victim's body upon entering a bedroom. The victim had been beaten and stabbed to death. Her clothes were in disarray, so that she was partially nude. The body had been wrapped in a sheet of black plastic in such a manner that only the upper torso was exposed.

"The local authorities were immediately notified. Close examination of the crime scene revealed bloodstains on the kitchen cabinets, door and ceiling. Attempts had been made to remove them. A mop, towels and male clothing were found with bloodstains on them. The defendant's watch, with bloodstains on the band, was also found. The bloodstains were of the same international blood type as that of the victim. A metal pipe belonging to the appellant was recovered and subsequently determined to be the weapon used to beat the victim.

"The appellant was arrested that night as he drove through Hartwell, Georgia. The officers found a loaded pistol under the seat of appellant's car and the appellant later made the statement that 'if he'd of known that the Hartwell Police would-had've done a good job of it and shot him, that he would've pulled his pistol up.'

"The appellant testified in his defense. He repeated the statement he told the victim's brother and father. He further testified that he later returned home and found the victim lying face down and fully clothed in his kitchen; that he tried to wipe the blood from her face but became sick; that although he did not know if the victim was dead or alive he did not call anyone but instead left to go to his sister's house in Hartwell, Georgia, to tell her."

Cape was tried before a jury in the Superior Court of Franklin County. He was convicted of murder, and the jury recommended the sentence of death based upon a finding of the statutory aggravating circumstance set forth in Ga.Code Ann. § 27–2534.1(b)(7) (Harrison 1977); Off.Code Ga.Ann. § 17–10–30(b)(7) (Michie 1982).[1]

---

1. Under Georgia law, the jury may impose the death penalty where it finds beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. Here, the jury found one aggravating circumstance:

"[T]he offense of murder ... was outrageously and wantonly vile, horrible or inhuman in

Cape subsequently filed a motion for a new trial, which was denied by the state trial court. The Supreme Court of Georgia affirmed the conviction and sentence on October 8, 1980. *Cape v. State,* 246 Ga. 520, 272 S.E.2d 487 (1980). The United States Supreme Court denied his petition for a writ of certiorari on January 26, 1981. *Cape v. Georgia,* 449 U.S. 1134, 101 S.Ct. 956, 67 L.Ed.2d 121 (1981).

Cape next filed a petition for a writ of habeas corpus in the Superior Court of Butts County, Georgia on March 27, 1981. Following an evidentiary hearing on May 19, 1981, during which four affidavits and ten depositions were introduced into evidence, the superior court denied habeas corpus relief in an unreported order entered on October 28, 1981. The Supreme Court of Georgia denied an application for a certificate of probable cause to appeal on February 24, 1982 and denied a petition for rehearing on March 24, 1982. The United States Supreme Court denied certiorari on October 4, 1982. *Cape v. Zant,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 147 (1982). A petition for rehearing was denied on November 29, 1982, 459 U.S. 1059, 103 S.Ct. 479, 74 L.Ed.2d 626 (1982).

On December 17, 1982, the petitioner filed the present petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia, Macon Division. The district court denied a motion for an evidentiary hearing on February 25, 1983 and entered a judgment denying the petition for a writ of habeas corpus on March 9, 1983. *Cape v. Francis,* 558 F.Supp. 1207 (M.D.Ga.1983). A subsequent "Motion for New Trial" was over-

ruled on March 28, 1983, after which a notice of appeal was filed to this court. The district court granted a certificate of probable cause to appeal on May 13, 1983.

## I.

Cape first complains that his fifth, sixth and fourteenth amendment rights were violated when the state trial court admitted expert psychiatric testimony that he was sane and criminally responsible for his conduct at the time of the killing.[2] He focuses on the fact that he was neither advised of his constitutional rights nor provided an adequate opportunity to consult with his counsel prior to the court-ordered examination which served as the basis for the expert testimony.

Prior to the trial, at the order of the presiding judge, Cape was examined at the state psychiatric facilities in Milledgeville, Georgia by Dr. Louis Jacobs. Counsel for the petitioner agreed to the interview.[3] (T. 12A).[4]

During the guilt/innocence phase of the trial, Dr. Jacobs was called by the state to testify as to the results of the psychiatric examination. Dr. Jacobs stated that he had conducted a complete evaluation of Cape, and that as part of that examination he had talked with Cape "at great length" concerning "the details of how he came there" and "the details of the difficulty he was in." (T. 562). Dr. Jacobs stated that as a result of the interview he had concluded both that petitioner was competent to stand trial and that he met "all of our criteria on evaluation for criminal responsibility" at the time of the alleged murder.

---

that it involved torture, depravity of mind or an aggravated battery to the victim." Ga.Code Ann. § 27–2534.1(b)(7); Off.Code Ga.Ann. § 17–10–30(b)(7) (Michie 1982).

**2.** Cape is entitled to make a constitutional attack on the psychiatric testimony here, notwithstanding the failure of counsel to object at trial, because he raised the issue in the state habeas corpus court and that court addressed the merits of his constitutional argument. *Ulster County Court v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777, 790 (1979); *Booker v. Wainwright,* 703 F.2d 1251, 1255 (11th Cir.),

*cert. denied,* —— U.S. ——, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983).

**3.** Cape's attorney was successful in procuring an independent psychiatric examination in addition to that conducted at the state facilities. (T. 12A). The results of that examination were not offered at the trial.

**4.** References to the transcript of the petitioner's state court trial are indicated by the abbreviation "T." followed by the number of the referred to page.

(T. 563–64). On cross-examination, Dr. Jacobs defined "mentally competent" to mean that the petitioner was aware of the charges against him, understood the function of his attorney and various officers of the court, and was aware of the possible outcome and consequences of the trial. (T. 568). On re-direct examination, Dr. Jacobs discussed the definition of "criminal responsibility":

> Q. Doctor, Mr. Keeble asked you about competency, and you also used the term "criminal responsibility". What did you mean by that?
>
> A. Well, in evaluating that, we always look to the criteria of a person's ability to distinguish between right and wrong, and their ability to act on that knowledge. We also begin to look for any compulsive delusional materials which might affect their ability to distinguish right from wrong or their ability to act on that knowledge, and we did not find any of the compulsive delusions nor any absence of an ability to distinguish between right and wrong in this patient.

(T. 569). In his closing argument, the assistant district attorney referred to this testimony and drew an inference from it:

> (Dr. Jacobs) used a couple of terms. One was "competency"; that his tests and evaluations—that he was competent. And he used the term, in his opinion, he was "criminally responsible" for his actions, under his tests and evaluation. The man is responsible for what he did on May 17. I submit to you that he did it. He killed her ...

(T. 760).

The foregoing sequence of events forms the basis for Cape's claim that the testimony of Dr. Jacobs contravened his fifth, sixth and fourteenth amendment rights. Cape cites *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), for the proposition that the fifth and fourteenth amendments prohibit the use of psychiatric testimony derived from a criminal defendant's incriminating statements where the defendant was not advised of his constitutional rights before making the statements. Cape acknowledges that testimony limited to the issue of a defendant's competence to stand trial is admissible, 451 U.S. at 465, 101 S.Ct. at 1874, 68 L.Ed.2d at 370, but notes that it is settled in this circuit that a defendant's "culpability or responsibility for the crimes charged against him" is a distinct issue, for fifth amendment purposes, from that of competency to stand trial, and that the fifth amendment *does* apply to testimony of a defendant's accountability at the time of the crime. *Battie v. Estelle*, 655 F.2d 692, 700–01 (5th Cir.1981).[5]

Cape also asserts that his right to counsel under the sixth and fourteenth amendments was abrogated by the psychiatric testimony, since the examination proved to be a "critical stage" of the aggregate proceedings against him. *Estelle v. Smith*, 451 U.S. at 470, 101 S.Ct. at 1877, 68 L.Ed.2d at 374; *Spivey v. Zant*, 661 F.2d 464, 476 (5th Cir. Unit B 1981), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982). Cape's attorney was not notified in advance of the examination that the psychiatrist would testify to matters other than the defendant's competency to stand trial. For this reason, he maintains that such a lack of notice rises to the level of constitutional infirmity because he was "denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." 451 U.S. at 471, 101 S.Ct. at 1877, 68 L.Ed.2d at 374.

It is not entirely clear from the testimony either that Cape admitted to Dr. Jacobs that he had committed the murder or, for that matter, that the murder itself was even discussed during the interview. As mentioned earlier, Dr. Jacobs testified only that he had talked with Cape about "the details of how he came there" and "the

---

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

details of the difficulty he was in." (T. 562). Such vague references to the course of the examination might reasonably be interpreted to mean that Cape told Dr. Jacobs only the same self-exculpatory story he related to the jury at the trial.

Regardless of what Cape actually told Dr. Jacobs, however, the psychiatrist's testimony went beyond permissible bounds. Contrary to the conclusion of the district court, *Cape v. Francis*, 558 F.Supp. at 1221,[6] the psychiatrist did not state merely that Cape was competent to stand trial. He went further and made note of Cape's "criminal responsibility at the time of this alleged occurrence." (T. 563–64). The psychiatrist specifically referred to criminal responsibility twice after answering questions concerning Cape's mental competency, and he defined the term "criminal responsibility."

■ As Dr. Jacobs' testimony indicates, criminal responsibility at the time of the alleged crime is qualitatively different from competency to stand trial. *See Battie v. Estelle*, 655 F.2d at 700–01. This difference is crucial to our fifth and fourteenth amendment analysis inasmuch as *Miranda* does not govern testimony limited to the defendant's competency to stand trial, *Smith*, 451 U.S. at 465, 101 S.Ct. at 1874, 68 L.Ed.2d at 370, but does apply to testimony of a defendant's criminal responsibility at the time of the occurrence. *Battie*, 655 F.2d at 700–01.

■ Dr. Jacobs' reference to Cape's criminal responsibility violated the petitioner's fifth and fourteenth amendment rights. The psychiatrist based his diagnosis on the substance of disclosures made during a custodial interrogation,[7] thus making Cape's communications to him testimonial in nature, *Smith*, 451 U.S. at 465, 101

S.Ct. at 1874, 68 L.Ed.2d at 370, and implicating the right against self incrimination.

■ This determination does not end our inquiry. The Constitution mandates a fair, not a perfect, trial, *United States v. Espinosa-Orlando*, 704 F.2d 507, 514 (11th Cir. 1983). It is well established that the admission of statements obtained in violation of *Miranda* may be harmless error. *See Harryman v. Estelle*, 616 F.2d 870, 875 (5th Cir.) (*en banc*), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). The challenged testimony must be examined in the light of all the evidence adduced at the trial to determine if admission of the testimony actually led to a compromise of Cape's fundamental right to a fair trial.

■ To invoke the harmless error rule, the court must be convinced beyond a reasonable doubt that the error did not contribute to the defendant's conviction. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This question cannot be answered by merely considering the error in isolation. *Harryman v. Estelle*, 616 F.2d 870, 876. "It is necessary to review the facts of the case and the evidence adduced at trial" to determine the effect of the unlawfully admitted evidence "upon the other evidence adduced at trial and upon the conduct of the defense." *Fahy v. Connecticut*, 375 U.S. 85, 87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171, 173 (1963). We must consider "whether, absent the so-determined unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt." *Harryman*, 616 F.2d at 876.

■ Ultimately, we must determine the degree of prejudice to the defendant resulting from the error. If, upon its reading of the trial record, the appellate court is firm-

---

6. The state habeas court had previously made a similar ruling. *Cape v. Zant*, Habeas Corpus File No. 5020 (Superior Court, Butts County, Oct. 28, 1981), at 12–13.

7. Contrary to a contention of the state, it is of no import that Dr. Jacobs did not testify directly as to any specific statements to him by the petitioner. It is enough that the psychiatrist based his expert opinion on the contents of responses by a defendant who had not been given proper warnings and had not had an adequate opportunity to consult with counsel. *E.g., Battie*, 655 F.2d at 695, 699–700.

ly convinced that the evidence of guilt was so overwhelming that the trier of fact would have reached the same result without the tainted evidence, then there is insufficient prejudice to mandate the invalidation of the conviction. *Null v. Wainwright,* 508 F.2d 340, 343 (5th Cir.), *cert. denied,* 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975).

Although we recognize that the harmless error doctrine establishes "an exacting standard that must be uncompromisingly applied," *Harryman,* 616 F.2d at 876, we have no difficulty in concluding that it is satisfied here. The tainted testimony had no prejudicial impact and had no effect on the ultimate outcome given the other overwhelming evidence of Cape's guilt. No reasonable doubt exists that Cape would have been found guilty regardless of Dr. Jacobs' testimony.

As stated before, Dr. Jacobs testified merely that Cape was "criminally responsible" at the time of the murder, a term he generally defined as the "ability to distinguish between right and wrong, and the ability to act on that knowledge." (T. 569). The prosecutor's reference to that testimony was equally circumscribed, as he noted Dr. Jacobs' opinion that Cape "was 'criminally responsible' for his actions, under his tests and evaluation," and further stated that Cape was "responsible for what he did." (T. 760).

Cape claims that this testimony was introduced for the purpose of showing that he had the intent to murder at the time of the crime. He characterizes the testimony and its reiteration as an affirmative attempt by the state to meet its burden of proving that he had acted with malice aforethought.[8] He asserts that the testimony prejudiced him during the guilt/innocence phase of the trial because it provided the only evidence of intent. He further alleges that this prejudice carried over to the sentencing hearing, arguing that the psychiatrist's testimony dissuaded the jury from concluding that the murder resulted from a momentary emotional reaction and thus did not warrant the death penalty.

The petitioner makes too much of the references to his "criminal responsibility." A fair reading of both Dr. Jacobs' testimony and the prosecutor's remarks leads to the conclusion that the references had nothing to do with the issue of intent in the sense that intent denotes "premeditation" or "malice aforethought." The "criminal responsibility" mentioned by Dr. Jacobs is the state of sanity itself—the possession of a rational mind capable of distinguishing right from wrong. The testimony essentially referred to the general status of Cape's mental health at the time of the murder and did not go to the narrow issue of whether Cape acted either deliberately or in response to momentary passion in committing the crime.[9]

---

8. Cape was convicted of murder under Ga.Code Ann. § 26–1101(a), which provides:

A person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

The statute defines murder as (1) unlawfully (2) causing the death of another human being (3) with malice aforethought. *Holloway v. McElroy,* 474 F.Supp. 1363, 1368 (M.D.Ga.1979), *aff'd* 632 F.2d 605 (5th Cir.1980), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981). Malice means a "deliberate intention" unlawful-

ly to kill another human being. Thus, because malice is an element of murder and deliberate intention to kill is a part of malice, intent to kill is an essential element of the crime of murder under Ga.Code Ann. § 26–1101(a). The state must prove the existence of every element of a criminal offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The prosecution therefore had the burden to prove beyond a reasonable doubt that Cape had the requisite intent to kill. See *Mason v. Balkcom,* 669 F.2d 222, 225 (5th Cir. Unit B 1982), *cert. denied,* 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983).

9. We disagree with the state that anticipation of an insanity defense justified introduction of the psychiatric testimony. In *Spivey v. Zant,* 661 F.2d 464, 475 n. 18 (5th Cir. Unit B 1981), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), the court indicated that where a

Under Georgia law, a defendant is presumed to have been sane at the time of the commission of the offense. *Fulghum v. State*, 246 Ga. 184, 269 S.E.2d 455, 456 (1980); *Pierce v. State*, 243 Ga. 454, 254 S.E.2d 838, 839 (1979). Cape never sought to rebut this presumption—his defense was simply that he did not commit the crime.[10] Given the fact that Cape never raised an insanity defense, the testimony was at worst redundant of the presumption, and the fifth and fourteenth amendment violation was thus harmless error.

Cape relies on *Estelle v. Smith, supra,* and *Spivey v. Zant, supra,* for his assertion that his sixth and fourteenth amendment right to counsel was abrogated by the testimony of Dr. Jacobs. In both *Smith* and *Spivey,* violations were found because psychiatric examinations of the defendants occurred at a "critical stage" of the respective proceedings.

In *Smith,* the Supreme Court followed a long line of cases holding that the sixth amendment right to counsel attaches to a defendant "at any stage of the prosecution ... where counsel's absence might derogate from the accused's right to a fair trial." 451 U.S. at 470, 101 S.Ct. at 1876, 68 L.Ed.2d at 373, *quoting United States v. Wade*, 388 U.S. 218, 226–27, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149, 1157 (1967). In *Smith,* the state trial court had ordered that the defendant undergo a psychiatric examination to determine his competency to stand trial, and after the psychiatrist concluded that he was competent, the de-

fendant was tried and convicted by a jury. State law then required a separate sentencing proceeding during which the defendant's future dangerousness, one of three factors necessary to the imposition of the death penalty was a crucial issue. At this sentencing hearing, the state called as a witness the psychiatrist who had conducted the pretrial examination. He testified, among other things, that the defendant was "going to go ahead and commit other similar or same criminal acts if given the opportunity to do so." Thereafter, the jury answered the question of future dangerousness in the affirmative, and imposed the death penalty. The Supreme Court found a sixth and fourteenth amendment violation in the fact that the defendant had not had the assistance of counsel in making "the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." 451 U.S. at 471, 101 S.Ct. at 1877, 68 L.Ed.2d at 374.

In *Spivey,* a panel of this circuit followed *Smith* in recognizing that the admission of psychiatric testimony may constitute a violation of a defendant's sixth and fourteenth amendment right where the defendant was denied assistance of counsel during the psychiatric examination and the testimony addressed a critical issue in the case. In *Spivey,* the defendant in a capital case was ordered to be examined "to determine his mental capacity at this time to understand the nature of the charges against him and to assist his attorney in the defense of his case." 661 F.2d 464, 473. At the trial, the

---

defendant takes affirmative steps to raise the issue of his mental condition at the time of the alleged crime, the state may have some leeway in its use of psychiatric testimony. The clear implication, however, is that where, as here, the defendant does not either assert an insanity defense or introduce expert psychiatric testimony, his full fifth, sixth and fourteenth amendments rights are preserved. In accordance with this principle, this court and the former Fifth Circuit Court of Appeals have inferred that neither defense counsel's advance approval of a psychiatric examination nor his request for a psychiatric examination waives these constitutional rights. *Battie,* 655 F.2d 692, 702; *Booker,* 703 F.2d 1251, 1256; *Witt v. Wainwright,* 714 F.2d 1069, 1075–76 (11th Cir.1983). However,

our rejection of the state's rationale goes simply to whether the testimony should have been admitted in the first place, not to the issue of whether any possible prejudice arose from the admission.

**10.** Cape did not dispute the fact of the murder. He simply denied his complicity in its commission. Nonetheless, independent, nonobjectionable evidence established a chain of events which inevitably pointed to Cape's guilt. Especially incriminating were the history of Cape's relationship with the victim, the recitation of Cape's activities and demeanor on the day of the murder, and the fact that the victim's corpse was discovered in Cape's house. This evidence amply supports the jury verdict.

examining psychiatrist was called by the state to testify in rebuttal to Spivey's insanity defense. The psychiatrist testified that his examination had led him to conclude that Spivey "had sufficient mental capacity to distinguish between right and wrong, that he was sane and that there was no indication that he was ever mentally incompetent, and that the examinations had not revealed any physical or behavioral abnormality that would support Spivey's claim that he had blackouts." *Id.* Spivey argued in his habeas petition that the testimony was improper because the order and examination occurred at a time when he was unassisted by counsel. The panel determined that the fact issue of whether Spivey had actually been represented at the time of the examination was unresolved, and remanded the case to the district court for an evidentiary hearing on the sixth amendment claim.

Both *Smith* and *Spivey* illustrate the heightened level of scrutiny that must be given claims of sixth and fourteenth amendment violations arising from the introduction of psychiatric testimony. The cases cannot be read, however, as establishing an absolute rule which mandates reversal in any instance where psychiatric testimony exceeds the scope anticipated by defense counsel at the time of the examination.

The essence of our focus must be whether the psychiatric examination proved to be a "critical stage" of the aggregate proceedings against the petitioner. Both *Smith* and *Spivey* make clear that such a determination turns upon the actual *use* of the testimony at trial. Such attention ultimately resolves the question "whether potential substantial prejudice to defendant's rights inheres in the ... confrontation and the ability of counsel to help avoid that prejudice." *Coleman v. Alabama,* 399 U.S. 1, 9, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387, 396

(1970), *quoting Wade,* 388 U.S. at 227, 87 S.Ct. at 1932, 18 L.Ed.2d at 1157.

In *Smith,* the testimony was critical to the state's burden of proving future dangerousness; in *Spivey,* the testimony was utilized to rebut the defendant's obviously decisive insanity defense. In each instance, then, there existed substantial prejudice. In the present case, however, no such prejudice—either actual or potential— is similarly manifest.

■ As we have previously noted, Dr. Jacobs' testimony did not truly address any issue essential to the jury's consideration— it was merely a comment on Cape's sanity at the time of the murder. By proving Cape's sanity, the State only proved a fact not necessary to its burden of proof. Consequently, the evidence was not "critical" to an issue in the case. Despite his broad assertions of prejudice, the petitioner cannot point to any impact that the psychiatric examination may have had on the outcome of his trial. In the absence of even such potential prejudice, it cannot be said that the petitioner was deprived of any right at a "critical stage" of the proceedings against him. Accordingly, we do not find any violation of the sixth and fourteenth amendments.

## II.

During the course of the trial, the state court judge admitted certain statements that had been made by Cape while in police custody and prior to the time he had the services of an attorney.[11] Cape complains that these statements were improperly admitted because the trial court only found that they had been made "voluntarily" (T. 452), and did not make a determination that he had "knowingly and intelligently waived his rights before making the inculpatory statement(s)." *Tague v. Louisiana,* 444 U.S. 469, 470–71, 100 S.Ct. 652, 653, 62 L.Ed.2d 622, 625 (1980), *citing Miranda v.*

---

11. Several police officers testified that Cape volunteered the statement that he would have drawn his gun if he had believed that the arresting officers would have shot him in response thereto. They also stated that Cape subsequent-

ly said that he did not want to make statements to the police, but instead preferred to talk to the sheriff at the jail. (T. 454–55, 466–68, 471–72). He was also quoted as having told officers that they need not look for anyone else. (T. 455).

*Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724.

At the trial, Cape objected to the introduction of the statements. The trial court then conducted a hearing in compliance with the dictates of *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, and summarily ruled that the statements had been "voluntarily made" by the defendant. (T. 426–52). Three witnesses then testified as to the incriminating statements. (T. 454–55, 466–68, 471–72).

Cape urges that the mere finding of voluntariness was not in itself sufficient to warrant admission of the statements. He contends that there must be an additional finding of a *knowing and intelligent waiver.* To support this argument, he relies primarily on *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 385 (1981), in which the Supreme Court held that voluntariness only goes to the question whether a defendant's will was overborne by coercion, while waiver is relevant to a determination of whether a defendant relinquished his rights knowingly and intelligently.

Cape correctly points out that *Edwards* differentiates between voluntariness and waiver. However, he is wrong in attempting to apply the *Edwards* strictures to the facts of this case. *Edwards* is specifically directed to those instances in which an accused has affirmatively invoked his right to have counsel present during custodial interrogation. 451 U.S. at 484, 101 S.Ct. at 1884, 68 L.Ed.2d at 386. Here, no such demand was ever made by the petitioner.

The testimony at the *Jackson v. Denno* hearing established that the officers informed Cape of his *Miranda* rights at the time of his arrest. Cape indicated that he understood those rights,[12] but at no time either asserted his right to remain silent or asked for an attorney.

In the absence of an invocation of the right to remain silent, we may presume that Cape knowingly and intelligently relinquished these rights. "Once warnings have been given, it is for the individual to indicate in any manner and at any time, prior to or during the questioning, that he wishes to remain silent." *United States v. Rice,* 652 F.2d 521, 527 (5th Cir.1981) citing *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1627, 16 L.Ed.2d at 723. Cape's failure to affirmatively invoke the right to remain silent constituted a waiver of that right. *United States v. Bosby,* 675 F.2d 1174, 1182 n. 13 (11th Cir.1982). The statements made by Cape after his arrest were properly admitted at the trial.

### III.

During the sentencing phase of the trial, Special Agent R.C. Patterson of the Georgia Bureau of Investigation testified about the circumstances of the crime (T. 778–80). Then, after stating that he had worked on "hundreds of homicides" in his 23-year career, he expressed these opinions:

> In twenty-three years I've seen a lot of brutal deaths, some maybe as brutal as this, but none any more or more severe than this death of Karen Dove. Added to that, a lot of times if you go to a death, it's an old person; they've lived a life. Karen did not. She was still just a child.

(T. 780). During cross-examination, Cape's attorney asked Patterson whether "a life is a life whether it's a child or an old person," and Patterson answered, "Absolutely. It's just the length of it that kind of bothers me." (T. 781). Cape insists that the admission of this testimony infringed upon his fourteenth amendment right to due process. He says that Patterson's testimony constituted both an improper appeal to the jurors' emotions and an attempt to abro-

---

12. At the *Jackson v. Denno* hearing, there was conflicting testimony as to whether Cape actually stated to the police officers that he understood the *Miranda* warnings, or whether he merely indicated his comprehension through silence. In any event, the Court was obviously satisfied that Cape fully understood his constitutional rights.

gate the statutory process of the proportionality review.[13]

■ We find no error of constitutional magnitude in the admission of Patterson's testimony. The testimony was within the scope of evidence permitted at presentence hearings and did not prejudice the petitioner.

In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court approved of the introduction of a "wide scope of evidence" at presentence hearings in Georgia capital cases.

> We think the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument ... So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

428 U.S. at 203–04, 96 S.Ct. at 2939, 49 L.Ed.2d at 891–92. (Citations omitted).

Patterson's testimony was directly relevant to the jury's consideration of a statutory aggravating circumstance. The testimony was offered to sustain the state's contention that the crime was "outrageously and wantonly vile, horrible or inhuman"[14] and was thus pertinent to the determination of punishment.

No prejudice can be said to accrue from Patterson's remarks. They were essentially redundant of evidence previously introduced concerning the brutality of the murder and the age of the victim, and merely added perspective to the evidence already before the jury. The evidence did not appeal to the jury's emotions in such a fashion that the death sentence ultimately could not have been imposed on a reasonable basis. The remarks were not critically material to the jury's deliberations and therefore cannot be said to have prejudiced Cape in a constitutional sense.

## IV.

In support of his allegation of ineffective assistance of counsel, Cape enumerates sixteen purported errors of his attorney. He asserts that considering the totality of these errors and the circumstances of the case, as well as the seriousness of the charge, his counsel did not render reasonably effective assistance, thereby substantially impairing his defense.

Our review of this issue begins with a recognition of a state criminal defendant's right to "counsel reasonably likely to render and rendering reasonably effective assistance." *Goodwin v. Balkcom*, 684 F.2d 794, 804 (11th Cir.1982), cert. denied, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). Application of this standard involves "an inquiry into the actual performance of counsel conducting the defense and a determination of whether reasonably effective assistance was rendered based upon the totality of circumstances and the entire record." *Nelson v. Estelle*, 642 F.2d 903, 906 (5th Cir.1981) (emphasis in original). Effective assistance does not mean errorless representation, *Goodwin*, 684 F.2d at 804, but instead means that a lawyer's performance falls "within the range of competency generally demanded of attorneys in criminal cases." *Mylar v. State*, 671 F.2d 1299, 1301 (11th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 3570, 77 L.Ed.2d 1411 (1983). Counsel's performance is measured not against the yardstick of hindsight but in the context of the circumstances as they appeared at the time. *Tucker v. Zant*, 724 F.2d 882, 892 (11th Cir.1984), citing *Ford v. Strickland*, 696 F.2d 804, 820 (11th Cir.) cert. denied, —— U.S. ——, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983). To prevail on this ground the defendant must "show that

---

**13.** Cape also claims that the alleged prejudicial effect of Patterson's testimony was compounded by what he calls inflammatory remarks of the prosecutor in closing argument at the sentencing stage. We do not see a direct connection between the opinion testimony of Patterson and the closing remarks of the prosecutor and therefore do not consider here the effect of the remarks.

**14.** See n. 1 *supra*.

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* — U.S. —, —, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

From a review of the record, it is apparent that the performance of Cape's counsel, although not errorless, was constitutionally adequate. Moreover, Cape has failed to prove that he suffered actual and substantial prejudice as a result of any flaw in his representation.

Testimony forming the basis for three of the errors alleged by Cape has been noted previously. Cape contends that his lawyer was ineffective in failing to object to the psychiatric testimony of Dr. Jacobs and in his cross-examination of the psychiatrist. He also faults the attorney's failure to object to the admission of his incriminating statements to arresting officers. Finally, he complains because counsel did not object to the testimony of Special Agent Patterson or move for a mistrial after its admission.

We perceive no constitutional error in the attorney's choice of strategy concerning the testimony of the psychiatrist. As stated before, Dr. Jacobs' testimony did not prejudice Cape—the testimony was at worst an indirect assertion that Cape had the intent to commit murder and, in any event, was merely cumulative. Further, contrary to Cape's contention, the constitutional basis of the challenge to the testimony was not strikingly evident, inasmuch as the decision of the former Fifth Circuit in *Smith v. Estelle,* 602 F.2d 694 (5th Cir. 1979), had been decided only two months before Cape's trial and was directed only to the issue of psychiatric testimony during the sentencing phase of a trial. Finally, his counsel's cross-examination of Dr. Jacobs was a reasonable attempt to at least partially discount the results of the psychiatric evaluation.

We find no critical error in the failure of counsel to object to the introduction of the incriminating statements Cape made to the arresting officers. As previously noted,

the statements were, in fact, properly admitted at trial. In addition, the cross-examination of the officers, which resulted in reiteration of the statements, was a reasonable and proper attempt to discredit their testimony.

Similarly, given our previous conclusion that the testimony of Agent Patterson was harmless beyond a reasonable doubt, we cannot say that the failure to object to this evidence is sufficient to establish a claim of ineffective assistance of counsel.

■ Cape faults his attorney's conduct in the pretrial hearing on a motion for a change of venue. He maintains that the motion was denied because no evidence was presented to demonstrate community prejudice although such evidence could have been obtained through interviews with defense character witnesses. We find no ineffectiveness of counsel in this respect, and adopt the language of the district court in its consideration of the same charge:

> In support of this claim petitioner presents conclusory affidavits as to the attitude of the community, but presents nothing specific to indicate that petitioner received anything other than a trial before a fair and impartial jury that was chosen despite substantial pretrial publicity. * * * Further, petitioner presents no specific evidence which was known by or available to his counsel and which, if presented, would have mandated a change of the venue of his trial.

*Cape v. Francis,* 558 F.Supp. 1207, 1217 (citations omitted).

Defense counsel is also charged with failing to ask the jurors certain specific questions on voir dire. The questions propounded to the jurors were completely adequate to elicit the information necessary to protect the rights and advance the cause of the petitioner.

Cape next alleges constitutional error in the conduct of defense counsel's examination of two state forensic expert witnesses. We have reviewed the relevant part of the transcript and, like the district court, find

that counsel performed his task in an able fashion.

█ Defense counsel is criticized for failure to object to testimony of the victim's step-mother and father concerning Cape's friendly attitude and interest toward the victim prior to her death. The evidence was admissible to establish motive. Consequently, the failure to object does not rise to the level of ineffectiveness.

█ Ola Cape, the petitioner's former daughter-in-law, related in detail Cape's purported sexual advances towards her in rebuttal to the testimony of Cape's character witnesses. Counsel for the petitioner did not object until two other witnesses had testified and the jury had left for the day. Although the defense attorney should have objected contemporaneously, Cape's rights were protected when the trial court granted the motion to strike the testimony and instructed the jury to disregard that evidence. (T. 706–09). Thus, the failure to contemporaneously object to this testimony did not result in a denial of fundamental fairness.

█ Cape complains of his lawyer's failure to object to several statements made by the prosecutor in his closing argument during the guilt/innocence phase and at the presentence hearing.[15] In keeping with our recent holding in *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied*, — U.S. —, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), we scrutinize the fervor of the prosecutor's remarks with a critical eye. Viewed in their contexts, however, the specific remarks complained of could have had no real prejudicial effect upon the jury. Thus, we cannot conclude that counsel was ineffective in failing to object to these statements.

█ Cape claims that his attorney was ineffective in failing to object to what he regards as a flaw in the court's charge on the defense of good character, and in omitting to submit a request to charge on mitigation. The court's instructions to the jury adequately conveyed the correct principles of law. There was no need for defense counsel to submit his own request to charge.

█ We do not detect any semblance of ineffectual representation during the penalty stage of the trial to support Cape's charge that his lawyer did not present sufficient mitigating evidence. Counsel investigated potential mitigating evidence and presented that which he felt would reflect favorably on his client. The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.

█ In his argument to the jury at the sentencing hearing, Cape's lawyer made the strategic choice to focus on policy considerations against the imposition of the death penalty rather than call attention to the character of the petitioner. We cannot discredit counsel's trial tactics in pursuing this course, taking into consideration the overwhelming evidence of guilt and the bizarre nature of the crime.

Cape finally contends that his counsel's appellate brief was lacking because life sentence cases were not cited for purposes of proportionality review, and constitutional error was not assigned to the testimony of Dr. Jacobs and Agent Patterson. He says that these omissions diminished his chances of succeeding on appeal.

**15.** The prosecutor, in his closing argument at the guilt/innocence trial, argued that the petitioner was a "taker of the worst kind," (T. 749), that you "can't keep your emotions out of it" (T. 749), that petitioner is "that killer over there" and "a killer, again, of the worst kind" (T. 750, 760), and that "[i]t's emotional" (T. 757).

At the penalty stage the prosecutor asserted, "the Bible supports mercy only for the merciful" (T. 789); petitioner is "a killer of the worst kind" (T. 790); "That young girl will never be able to experience life" (T. 791); "Genesis says 'Who so sheddeth man's blood by man, his blood be shed.'" (T. 792); and "Karen is going up the ladder now. I'm sure she's looking upward with great tears. * * * Place Karen Dove at rest. * * * She has spoken." (T. 792–93.)

**1302**

■ The Supreme Court of Georgia is not required to consider life sentence cases in its proportionality review. Hence, counsel was not constitutionally ineffective for failing to delineate such cases. Nor did harm accrue from the failure to raise constitutional objections to the testimony of Dr. Jacobs and Agent Patterson, given our full consideration of such claims here and our conclusion that no prejudice arose from the testimony.

We are mindful of the many obstacles and pitfalls that confront lawyers in the defense of capital murder cases. The responsibilities and pressures are awesome. In retrospect, one may always identify shortcomings. For the most part, though, the petitioner's counsel acted ably in advancing Cape's defense, and even those errors of judgment we have noted neither strengthened the state's case nor weakened the defense. We conclude, therefore, that Cape received reasonable and effective assistance of counsel.

### V.

Cape attacks both the constitutionality and the application of the statutory aggravating circumstance found by the jury, Ga. Code Ann. § 27–2534.1(b)(7).[16]

■ The first prong of this challenge— that the United States Supreme Court has held the (b)(7) provision unconstitutional— stems from a misreading of Supreme Court decisions. In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court found that section (b)(7) was not unconstitutional on its face, a holding it reiterated in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Court did say that the provision may be *applied* unconstitutionally, but such a recognition does not amount to a plain finding that the circumstance is inherently overbroad or vague.

■ Cape's second argument, that the trial court's instructions to the jury did not properly define the statutory aggravating circumstance, is also without merit. The

court read the (b)(7) provision to the jury and instructed them that they may consider that one aggravated factor if it was supported by the evidence. Under the facts of this case, the trial court was required to do no more. Thus, this contention does not constitute a basis for habeas corpus relief. *See Westbrook v. Zant*, 704 F.2d 1487, 1501 (11th Cir.1983).

### VI.

■ The obligation of the Supreme Court of Georgia to conduct proportionality review emanates from Ga.Code Ann. § 27–2537(c) (Harrison 1977); Off.Code Ga.Ann. § 17–10–35(c) (Michie 1982), which requires that the court determine:

[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Under this statutory mandate, the Georgia Supreme Court must ensure:

that no death sentence is affirmed unless in similar cases throughout the state the death sentence has been imposed generally * * *." *Moore v. State*, 233 Ga. 861, 864, 213 S.E.2d 829, 832 (1975), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3222, 49 L.Ed.2d 1218 (1976).

Cape urges that the state Supreme Court did not consider those appellate decisions in which life sentences were imposed, and that it thereby failed to fulfill its statutory duty.

The proportionality review provision does not specifically require consideration of life sentence cases, and in the absence of such a mandate there was no error in the court's review of this case. Moreover, we decline to indulge in the presumption that merely because the Supreme Court of Georgia does not cite life sentence cases in the appendices to its decisions it does not consider the facts in those cases. We reject Cape's contention that the proportionality review conducted by the Georgia Supreme

16. See n. 1 *supra.*

Court was constitutionally defective in this case.

## VII.

Cape finally alleges that the district court erred in refusing to grant him an evidentiary hearing to develop material facts he contends are crucial to the resolution of a ground for relief he first raised in the state habeas corpus court that the death penalty is applied in Georgia in a discriminatory manner. The state habeas corpus court heard testimony on this claim and ruled that the evidence offered by Cape was insufficient to sustain it. Cape now says that he has expert testimony that was unavailable to him at the time of the state habeas hearing because the state court denied his request for funds to pursue this avenue of relief.[17]

The mere assertion of the present availability of such testimony is not enough to compel an evidentiary hearing. A state court's written factual findings are presumed correct in a federal district court unless the applicant can establish one of the exceptions enumerated in 28 U.S.C. § 2254(d)[18]. *Sumner v. Mata,* 449 U.S. 539, 545–46, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722, 729–30 (1981). None of the exceptions apply here. Cape participated in the state habeas corpus hearing and introduced evidence to support his allegations. He had a full opportunity to prove his grounds for relief. When a state court affords a petitioner a full and fair evidentiary hearing on all facts and issues, a federal district court is not required to conduct an evidentiary hearing. *Hance,* 696 F.2d at 957. The district court correct-

17. Cape does not contend that the state habeas court acted illegally in denying such funds. Under Georgia law, indigent defendants have "no right to receive or spend state funds for the appointment of experts or investigators in habeas corpus proceedings, even in death penalty cases." *Spencer v. Hopper,* 243 Ga. 532, 255 S.E.2d 1, 4, *cert. denied,* 444 U.S. 885, 100 S.Ct. 178, 62 L.Ed.2d 116 (1979). Nor does he claim that the evidence that he actually presented at the state hearing was in itself sufficient to warrant a finding that the death penalty is applied in Georgia in a discriminatory manner.

18. 1. Title 28 U.S.C.A. § 2254(d) states that:

(d) In any proceeding instituted in a Federal court by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceedings;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding; or

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

ly concluded that Cape had a full and fair evidentiary hearing at the state level and did not err in denying an additional evidentiary hearing.

Finding no constitutional error to warrant the issuance of the writ, we AFFIRM the judgment of the district court.

HATCHETT, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion except its holding that Cape's psychiatric examination failed to constitute a "critical stage" of the proceedings. The majority's holding is supported by a "critical stage" analysis contrary to binding precedent. Since the state failed to notify Cape's attorney of the examination, it violated Cape's sixth amendment right to counsel, and his conviction must be overturned.

The sixth amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." The Supreme Court has held that the "right to counsel attaches at or after the initiation of adversary judicial proceedings against the defendant." *United States v. Gouveia,* — U.S. —, —, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984). *See also Brewer v. Williams,* 430 U.S. 387, 398–99, 97 S.Ct. 1232, 1239–40, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). The Court has extended the sixth amendment guarantee of counsel to "certain 'critical' pretrial proceedings." *Gouveia,* — U.S. at —, 104 S.Ct. at 2298; *United States v. Ash,* 413 U.S. 300, 309–10, 93 S.Ct. 2568, 2573–74, 37 L.Ed.2d 619 (1973); *United States v. Wade,* 388 U.S. 218, 223–27, 87 S.Ct. 1926, 1930–32, 18 L.Ed.2d 1149 (1967). In *Wade,* the Court explained its extension of the right to counsel to "critical" pretrial proceedings:

> When the Bill of Rights was adopted, there was no organized police forces as we know them today. The accused confronted the prosecutor and the witnesses against him, and the evidence was marshalled, largely at the trial itself. In

contrast, today's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality. In recognition of these realities of modern criminal prosecution, our cases have construed the Sixth Amendment guarantee to apply to 'critical' stages of the proceedings.

*Wade,* 388 U.S. at 224, 87 S.Ct. at 1931. Certain "critical" pretrial proceedings obviate the necessity for a trial, and therefore, a lawyer's presence and advice are essential at these pretrial stages. *Wade,* 388 U.S. at 235–36, 87 S.Ct. at 1936–37 (lawyer's presence at the pretrial lineup would prevent unfairness and lessen the hazards of eyewitness identification); *Hamilton v. Alabama,* 368 U.S. 52, 54–55, 82 S.Ct. 157, 158–159, 7 L.Ed.2d 114 (1961) (presence of counsel at arraignment would have aided the accused in knowing the available defenses and pleading intelligently). *See also Coleman v. Alabama,* 399 U.S. 1, 8–10, 90 S.Ct. 1999, 2002–2004, 26 L.Ed.2d 387 (1970) (accused's attorney's presence at preliminary hearing protects accused against improper prosecution and aids accused's preparation of a proper defense); *Massiah v. United States,* 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (attorney's presence at interrogation could have protected the accused from prosecutorial overreaching).

In *Wade,* the Court articulated the analysis to determine whether a pretrial confrontation constitutes a "critical stage" requiring the presence of counsel. The Court stated, "[i]t calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *Wade,* 388 U.S. at 227, 87 S.Ct. at 1932. The Court's emphasis on curing potential prejudice reflects its concern that an accused might lose rights at a pretrial proceeding without the aid and advice of an attorney. *See also United States v. Ash,* 413 U.S. 300, 313, 93 S.Ct.

2568, 2575, 37 L.Ed.2d 619 (1973) (a determination of a "critical stage" depends on "whether the accused required aid in coping with legal problems or assistance in meeting his adversary").

A court-ordered psychiatric examination presents a situation where the attorney could benefit the accused in various ways. In *Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979), *aff'd*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Fifth Circuit explained the importance of the lawyer's role in helping his client undergo a psychiatric examination. The court stated:

> This is a vitally important decision, literally a life or death matter. It is a difficult decision even for an attorney; it requires a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, of possible alternative strategies .... For a lay defendant, who is likely to have no idea of the vagaries of expert testimony and its possible role in a capital trial, and who may well find it difficult to understand, even if he is told, whether a psychiatrist is examining his competence, his sanity, his long term dangerousness for purposes of sentencing, his short term dangerousness for purposes of civil commitment, his mental health for purposes of treatment, or some other thing, it is a hopelessly difficult decision.

*Smith*, 602 F.2d at 708–09.

Significant potential prejudice inheres to the accused when he submits to a psychiatric examination without prior consultation with his lawyer. Without the advice of his lawyer, the accused would fail to comprehend the benefits of the fifth amendment and would be susceptible to prosecutorial overreaching. Moreover, the accused may not understand the purposes behind the examination or the vagaries of expert testimony. The lawyer could also explain the rationale for undergoing the examination to the accused. These reasons exemplify the potential prejudice which inheres to an accused in undergoing a psychiatric examination without prior consultation with his lawyer. Such a pretrial proceeding requires the advice and aid of a lawyer and, therefore, constitutes a "critical" pretrial proceeding. *See Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Hamilton v. Alabama*, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961).

Despite the obvious necessity for a lawyer to consult with the accused prior to the psychiatric examination, the majority holds that such a pretrial proceeding fails to constitute a "critical stage;" and therefore, Cape was not entitled to an attorney prior to the examination. In determining whether Cape's psychiatric examination constituted a "critical stage," the majority examines the *actual use* of the psychiatrist's testimony at trial. The majority cites no cases supporting its "critical stage" analysis. Indeed, no cases exist supporting the majority's analysis. The majority's holding is contrary to the Court's dictate in *Wade* requiring a court to examine a pretrial proceeding to determine if *potential* prejudice inheres to the accused from the confrontation. The litany of Supreme Court cases defining the parameters of the sixth amendment right to counsel emphatically holds that courts review the confrontation itself to see if the accused needs a lawyer's aid.[1] The use of the evidence gained from the confrontation is irrelevant to a determination of "critical stage."[2] The majority,

---

1. In *United States v. Ash*, the Court summarized its cases articulating the "critical stage" analysis: "This review of the history and expansion of the Sixth Amendment counsel guarantee demonstrates that the test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *Ash*, 413 U.S. at 313, 93 S.Ct. at 2575.

2. The use of the evidence gained from a pretrial proceeding would be useful in determining whether the sixth amendment violation constituted harmless error. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The total denial of assistance of counsel, however, can never be harmless error. *United States v. Cronic*, — U.S. —, — n. 25, 104 S.Ct. 2039, 2047 n. 25, 80 L.Ed.2d 657 (1984) ("[t]he Court has uniformly found constitutional error without any showing of prejudice when

today, however, refuses to follow Supreme Court precedent and fashions a novel approach to sixth amendment jurisprudence. I, therefore, respectfully dissent.

counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."). *See also Strickland v. Washington,* — U.S. ——, ——, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (reaffirming that total denial of the assistance of counsel cannot constitute harmless error).