697 So.2d 529 (1997)
Rondale Voncha CARTER, Appellant,
v.
State of FLORIDA, Appellee.
No. 95-4354.
District Court of Appeal of Florida, First District.
June 4, 1997.
Rehearing Denied August 5, 1997.
*530 Spiro T. Kypreos, Pensacola, for Appellant.
Robert A. Butterworth, Attorney General, and Daniel A. David, Assistant Attorney General, Tallahassee, for Appellee.
MICKLE, Judge.
In this direct appeal, Rondale Voncha Carter challenges his conviction for the first-degree murder of Phuc Cong Tran (hereafter referred to as "Tran") with a firearm. Concluding that the trial court abused its discretion by excluding certain opinion testimony of a defense psychologist relating to the appellant's mental capacity to understand his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), during a custodial interrogation, we are constrained to reverse the conviction and to remand for a new trial.
In its indictment, the State charged the 17-year-old appellant with the premeditated first-degree murder of Tran (Count One), conspiracy to deliver cocaine (Count Two), and possession of a firearm in the commission of a conspiracy (Count Three). At the end of all testimony, a motion for judgment of acquittal on Counts Two and Three was granted. According to the appellant's statements and testimony, the events leading to the death of Tran began when the appellant, "Little Jack" Carter (the appellant's uncle), and several other individuals (including the decedent, whom the appellant had not previously met) visited a "crack house," where they smoked "crack" and drank alcohol. Later, the appellant drove his uncle and Tran to a motel, into which the decedent went and then returned to the vehicle. While the appellant drove them around, the uncle and the decedent began arguing. After the vehicle stopped again, Tran got out, and the uncle placed a .38 calibre revolver on the front seat and pursued Tran. The uncle and Tran proceeded to "tussle" and "throw blows" outside the vehicle. The appellant initially remained inside the vehicle, but eventually he became concerned for his uncle's safety, grabbed the.38, and fired a shot in an effort to stop the fighting. The appellant heard his uncle say, "He got my product." As the appellant fired another shot to scare him, Tran started running away. According to the appellant's testimony, while following behind Tran he fired several more shots "at an angle" with the intent to scare Tran or to stop him from running away, not to kill him. After the decedent fell to the ground, the appellant observed his uncle going through Tran's pockets, and then the appellant and his uncle drove away. Tran had been hit by multiple shots fired from a .38 revolver. Several months later, the authorities picked up the appellant and took him to the police station *531 for questioning, during which he made some inculpatory remarks.
After recounting the events that led to the August 1994 shooting death of Tran, the appellant testified about the circumstances under which he had made the self-incriminating statements. On December 1, 1994, the police picked him up and took him to a small, windowless interview room where his requests for permission to visit the restroom, to call his mother, and to get something to drink were denied. Although he admitted having signed the waiver of rights form at 8:00 A.M. on the date in question, the appellant testified that he had been scared and "didn't mostly understand" it. He claimed that he was not notified of the Tran murder investigation until after he signed the waiver form, for the apparent basis for taking him into custody had been a warrant for his violation of probation. Initially, trying to cover up the suspected involvement of his uncle in the charged crimes, the appellant claimed that only he and Tran had been present at the crime scene. Alternatively, the appellant indicated that an imaginary third person had been present. Appellant had reasoned that as a juvenile without a prior record, he would be treated better by the authorities than would his adult uncle, who has a criminal record. Appellant testified that although he had asked for an attorney, he did not understand his rights, including the right to remain silent and the consequences of making certain self-incriminating statements to protect his uncle. Although the appellant exercised his right to testify on his own behalf, the defense was not allowed to present all of the available relevant evidence in support of its theory that he had not fully comprehended or understood his Miranda rights.
The defense filed a motion to suppress any statement made by the appellant to authorities on the grounds that it had been coerced and involuntary and had been obtained after he requested assistance of counsel. The motion was denied, and the appellant contends that it was error to allow into evidence proof of his recorded self-incriminating statements.
At the March 20, 1995, hearing on the motion to suppress, John Sanderson, an Escambia County deputy sheriff, testified that on December 1, 1994, the appellant had been transported to the sheriff's office for an interview. Prior to questioning, Sanderson read a rights waiver form to the appellant, who signed it and agreed to waive his rights and to give a statement. The appellant expressly acknowledged his understanding of the contents of the waiver. The appellant had indicated having an 11th-grade education as well as the ability to read and write. When Sanderson decided to record some of the appellant's statements at 11:40 A.M., he advised the appellant of his rights. After Sanderson asked him to start at the beginning and to tell him what had happened, the appellant asked, "Can I get a lawyer?" The deputy answered, "Sure. You want one now?" whereupon the appellant answered affirmatively. Immediately, Sanderson announced, "This concludes the recorded statement," and the taping stopped. Officer Terry Lee Kilgore telephoned the Office of the State Attorney. Almost immediately after the tape recorder was turned off, the appellant apparently changed his mind and informed the officers that he now wished to tell them what he had done. According to Sanderson, the appellant "was pretty much pleading with us" to resume the interview. After Kilgore returned to the interview room, the conversation was renewed at 11:55 A.M. As Kilgore recapitulated the events constituting the change of heart, the appellant indicated, "I thought about it." When asked, "Do you want an attorney?" the appellant answered "No." Without being questioned about the alleged criminal activity, the appellant volunteered, "I think I just wanted to say that I did it, but ... it wasn't like I tried to do it." When asked to clarify what he meant, the appellant said, "I didn't mean to kill the man." The taping concluded at 12:05 P.M.
Officer Kilgore testified that when the appellant requested an attorney, the initial interview concluded. However, as the tape was turned off, the appellant said, "No, no, no, wait, I want to get things clear for the record." Kilgore informed him that it was too late for further discussion because the appellant had asked for counsel. After the *532 appellant reiterated his wish to talk to them further, Kilgore and Sanderson stepped outside the room to discuss the matter, and then Kilgore called the Office of the State Attorney. Only after the officers requestioned the appellant about his present wishes in regard to counsel, and he affirmatively and clearly indicated that he no longer wanted a lawyer, was the colloquy renewed. Both officers denied that the appellant was mistreated or subjected to coercive conditions. We conclude that the officers' conduct satisfied the requirements of Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (if a suspect expresses both a desire for counsel and an intent to continue the interview without counsel, any further official inquiry is limited to clarifying the suspect's wishes); State v. Evans, 462 So.2d 596 (Fla. 5th DCA 1985) (defendant may voluntarily change his mind after invoking right to counsel, so long as waiver is knowing and intelligent).
In its order denying the motion to suppress, the trial court found 1) that the appellant had knowingly and intelligently waived his rights afforded by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); 2) that after requesting an attorney (and thereby suspending the interview), the appellant initiated further conversations with the officers and sought to go forward with the interview; 3) that the officers made every effort to protect the appellant's constitutional rights; 4) that after the appellant sought a renewal of discussions, the officers questioned him solely to ascertain whether he no longer wanted an attorney; and 5) that the appellant then freely and voluntarily made a recorded statement after affirmatively waiving the right to counsel.
The Supreme Court of Florida has held that "[t]he question of the admissibility in evidence of an extra-judicial confession is for the court to decide, based on all the circumstances of the confession." Palmes v. State, 397 So.2d 648, 653 (Fla.), cert. den., 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981); Brewer v. State, 386 So.2d 232 (Fla. 1980). A valid waiver of Miranda rights must be knowingly and intelligently made. Miller v. Dugger, 838 F.2d 1530, 1538 (11th Cir.), cert. den., 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). It is the State's burden to show by a preponderance of the evidence "that the confession was freely and voluntarily given and that the rights of the accused were knowingly and intelligently waived." State v. Mallory, 670 So.2d 103, 106 (Fla. 1st DCA 1996) (emph. in orig.). The trial court's finding that the appellant's confession was voluntary is clothed with a presumption of correctness. Viewing the evidence and inferences in a light most favorable to affirming the ruling, we conclude that the lower tribunal correctly denied the motion to suppress the confession. Durocher v. State, 596 So.2d 997, 1000 (Fla.1992) (no Fifth-Amendment violation occurred where defendant, not police, initiated his confession to uncharged murder, where defendant and police knew he had invoked constitutional right to counsel with respect to prior murder charge and that counsel was available, but defendant adamantly expressed his desire not to invoke Fifth-Amendment rights with respect to uncharged murder); Rubasky v. State, 401 So.2d 894 (Fla. 5th DCA) (when competent evidence supports the trial court's ruling on a motion to suppress, no basis for reversal exists), cert. den., 454 U.S. 973, 102 S.Ct. 524, 70 L.Ed.2d 393 (1981); State v. Ferrer, 507 So.2d 674 (Fla. 3d DCA 1987) (defendant's verbal confession, given after invoking right to counsel, reinstituting contact with police, and receiving Miranda rights, was voluntary even though he refused to make written statement without presence of counsel); Collier v. State, 353 So.2d 1219 (Fla. 3d DCA 1978).
In addition to challenging the admission into evidence of his statements to the authorities, the appellant argues that it was improper for the trial court to exclude certain expert testimony offered by the defense. Upon the defense's motion to reconsider the suppression question, the trial court held an August 18, 1995 hearing. Questioning whether the appellant had knowingly, intelligently, and voluntarily waived his rights, the defense offered as its witness Robert Defrancisco, Ph.D., an Alabama clinical psychologist who was qualified as an expert in that field. The appellant was 17 years old at the time of the murder and 18 years old when he was *533 tested by Dr. Defrancisco. After interviewing and testing him, Dr. Defrancisco had concluded that the appellant is "marginally literate," with an I.Q. of 79 and a 6th-grade reading level, and has subnormal comprehension and short-term memory "significantly below normal." Diagnostic testing disclosed a previously undiagnosed and untreated bipolar (mood) disorder, or manic depression, which, according to Dr. Defrancisco, can lead to accelerated mental and physical activity, moodiness and restlessness, emotional instability, poor judgment, extreme irritability, and low frustration tolerance. Testing also revealed a history of alcohol abuse. Relying on his assessment of the appellant's I.Q., achievement, verbal reasoning skills, and personality, Dr. Defrancisco had formed "definite conclusions" relating to the appellant's ability to understand and to waive his Miranda rights, and the expert was prepared to testify that the appellant had not knowingly, intelligently, and voluntarily waived those rights.
The State objected to any testimony relating to the results of, and conclusions from, Dr. Defrancisco's testing of the appellant conducted pursuant to a procedure designed by Dr. Tom Grisso. The "Grisso Test" is intended to assist a forensic expert in determining whether a juvenile who has waived his rights actually comprehended 1) what was being said as well as 2) the significance and implications of the statement of Miranda rights. Anticipating the State's objection to Dr. Defrancisco's opinions, the trial court allowed a voir dire examination, during which the expert indicated that the Grisso Test is not a commonly used, nationally recognized test, and that the defense's attempt to use the Grisso Test results to challenge the appellant's ability to comprehend his Miranda rights was "very unusual." We conclude that, with respect to the Grisso Test results, the trial court properly found that the defense had not laid an adequate foundation to satisfy the requirements of Frye v. United States, 293 F. 1013 (D.C.Cir.1923). The State's objection was sustained, and Dr. Defrancisco was not allowed to opine as to whether the appellant had knowingly and voluntarily waived his rights. The motion to reconsider was denied.
Unlike the Grisso Tests, the tests relating to I.Q., personality, verbal reasoning skills, achievement, and diagnostic results were not subject to any specific objections from the state. We find it significant that, after specifically objecting to the introduction of the Grisso Test results, the prosecutor stated, "Certainly, if the Court wishes to consider what I.Q. or what other tests have been considered that were given by the expert, I have really no objection to that."
Prior to jury selection, the State filed a motion in limine to exclude Dr. Defrancisco's testimony at trial. Defense counsel wanted to introduce testimony relating to the appellant's mental condition to support the theory of self-defense as well as the defense that he lacked the requisite premeditation and specific intent to commit the murder. The issue was revisited just before opening statements. The defense argued that all the tests in question would satisfy Frye, that they were relevant to the issue of whether the appellant was capable of comprehending his Miranda rights, and that the expert testimony would assist the jury in fulfilling its duty to weigh the evidence and to assess witness credibility relating to the circumstances surrounding the appellant's incriminating statements. The trial judge concluded that Dr. Defrancisco's opinion that the appellant "perhaps did not have sufficient mental abilities to understand fully and intelligently the rights that he was waiving under Miranda "constituted "a novel idea," for "few others in the scientific community or psychological community or psychiatric community ... perform these tests." The lower court suggested, but did not explicitly find, that the prospective testimonyeven that relating to the I.Q., achievement, personality, verbal reasoning skills, and diagnostic testswould not satisfy the requirements of Frye insofar as the testimony was intended to show whether the appellant understood his rights and voluntarily waived them. Defense counsel argued that whether a defendant understands his rights constitutes "the whole root" of Miranda protections, so that a defendant who claims a lack of understanding of those rights should be permitted to introduce expert testimony relating to his skills of memory and *534 comprehension. After the state rested, the defense made a proffer of Dr. Defrancisco's anticipated testimony, and a final request to allow the expert to testify before the jury was denied. During closing argument, the prosecutor directly responded to the arguments previously made by the defense (in its unsuccessful efforts to introduce Dr. DeFrancisco's proffered opinion that the appellant had not fully and intelligently understood the waiver of rights) and asserted that the appellant "knew exactly what was going on" when he signed the waiver of rights form and gave the recorded statement.
We must decide whether the trial court reversibly erred by excluding Dr. Defrancisco's testimony relating to the appellant's mental capacity and comprehension during the custodial interview. Among the factors that may be considered in determining whether a waiver was knowingly and intelligently made are "mental capacity or I.Q., age, physical condition, demeanor, coherence, articulateness, capacity to make full use of one's faculties, memory, level of education, level of reading skill, time of interrogation, [and] prior record or experience with the criminal justice system." State v. Crosby, 599 So.2d 138, 142 (Fla. 5th DCA 1992). As it is clear from the proffered testimony that the defense was offering Dr. Defrancisco's opinions to address several of these relevant factors, we conclude that the trial court should have allowed the psychologist's testimony to the extent that it is relevant and material. The exclusion of Dr. Defrancisco's testimony deprived the jury of relevant, material information that could have helped them to gauge the appellant's credibility and to decide how much weight to give the evidence relating to the waiver of rights form and the incriminating statements. As the State specifically argued in closing remarks that the appellant had known what was going on during the interview, we cannot say that the error in excluding all of Dr. Defrancisco's testimony was harmless beyond a reasonable doubt. The State expressly indicated on the record that it did not object to the trial court's consideration of the tests other than the Grisso Test. Given these circumstances, we conclude that the trial court abused its discretion in its blanket exclusion of relevant and material testimony relating to the tests other than the Grisso Test, especially given the state's subsequent argument to the jury that the appellant "knew exactly what was going on" when he signed the waiver of rights form and made certain incriminating statements. Our holding on this evidentiary issue renders it unnecessary to address any of the other issues raised on appeal.
REVERSED and REMANDED for a new trial.
MINER and ALLEN, JJ., concur.